UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID GREEN, <br> P.O. Box 195 <br> Harper, TX 78631 <br><br> Plaintiff, <br><br> v. <br><br> DENIS MCDONOUGH, <br> Secretary, <br> U.S. Department of Veterans Affairs, <br> 1722 I Street, NW <br> Washington, D.C. 20421, <br><br> Defendant. | Case No.: 21-2359 <br><br><br> JURY TRIAL DEMANDED <br><br><br><br> Date:   September 6, 2021 |

# COMPLAINT

COMES NOW comes now Plaintiff David Gree, by his undersigned counsel, with his complaint of unlawful employment discrimination against Dennis McDonough in his official capacity as Secretary of the Unites States Department of Veterans Affairs (VA or the Agency), for violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, based upon the facts and circumstances of his employment with the VA.

Mr. Green began working as a Biomedical Equipment Support Specialist at the Agency in 2011, having nearly 40 years' experience in the field at the time.  With his exemplary skills and extensive experience, Mr. Green expected little difficulty advancing to a higher grade. However, Mr. Green was the oldest biomed tech in his shop, and his managers immediately commented on his old age and white hair in a disparaging manner.  But this was not mere ribbing.  Mr. Green's managers deliberately blocked his attempts at career development and promotion.  Meanwhile, much younger employees with far less experience and inferior

1

qualifications were afforded every advantage. Mr. Green engaged the EEO process in an attempt to combat this blatant disparate treatment, and his supervisor responded by lowering Mr. Green's performance rating, saying he did so because Mr. Green had filed EEO complaints, and calling subordinates who did not dare to engage the EEO process more "worthy" than Mr. Green. For this reason, the Agency issued a Final Agency Decision (FAD) finding that Mr. Green was subjected to unlawful reprisal with respect to his performance review at the hands of his first-line supervisor, whom the Agency found to lack credibility. However, the Agency erroneously denied Mr. Green's other claims of discrimination. Having exhausted his administrative remedies, Mr. Green now brings the instant lawsuit.

## PARTIES

1. Plaintiff, David Green, is a United States citizen and resident of the state of Texas. He is an employee of the VA.

2. Defendant, the VA, is a federal agency, headquartered in Washington, D.C.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S. Code § 1331, as this complaint brings a federal question under the laws of the United States, plaintiff's complaint being brought pursuant to the Americans with Disabilities Act.

4. Venue is proper pursuant to 28 U.S.C. § 1391 as this is the judicial district in which defendant resides.

5. This Court has jurisdiction over this complaint because plaintiff has exhausted his administrative remedies. June 8, 2021, plaintiff received the final decision on his appeal to the Equal Employment Opportunities Commission (EEOC) Office of Federal Operations (OFO).

*Background Facts*

6. Mr. Green is a veteran of the United States Army, and a veteran of the biomedical field, having more than 46 years' experience in the field.

7. In April 2011, Mr. Green started with the Agency as a Biomedical Equipment Support Specialist Position, GS-9.

8. Mr. Green was born in October 1949.

9. Mr. Green has filed three complaints of discrimination based upon age and/or retaliation against the Agency, on May 21, 2015, June 8, 2016, and August 6, 2018.

*Mr. Green's Supervisory Chain*

10. Mr. Green was initially supervised by Mr. Michael Schneider, Supervisory Biomedical Engineer, GS-12.

11. Mr. Schneider was born in May 1957. Mr. Schneider is aware of Mr. Green's EEO activity.

12. Mr. Schneider was aware of Mr. Green's age by his appearance, and he remarked that Mr. Green was the only man in the shop who has white hair. He was also aware that Mr. Green was near (or at) retirement age, and he discussed Mr. Green's retirement.

13. During this time, Mr. Green's second-line supervisor was Mr. Zachary Collins, Chief, Biomedical Engineer, GS-12.

14. Mr. Collins was born in January 1983. Mr. Collins was aware of Mr. Green's EEO activity. Mr. Collins knew Mr. Green was over 40 based upon his appearance.

15. Eventually, Mr. Schneider left his position, and Mr. Collins took over as Mr. Green's first and second-line supervisor.

16. Subsequently, Mr. Collins left his position, and Mr. Michael Smith, Assistant Chief Engineer, GS-13, became Mr. Green's temporary first-line supervisor.

17. Mr. Smith was born in March 1963. Mr. Smith was aware that Mr. Green filed EEO complaints in 2015 and 2016.

18. In or around November 2018, Mr. Lavonne Melton became the Supervisory Biomedical Equipment Support Specialist, and Mr. Green's first-line supervisor. Mr. Melton was born in April 1973.

*Mr. Green's Experience*

19. In over 46 years, Mr. Green has extensive experience in the Biomedical field, to include:

    a. Regional Service Engineer and Senior Field Engineer for Litton X-Ray

    b. Product Manager for Siemens Gamasonic (a major medical equipment company)

    c. Customer Service Representative for Sony Electronics working with Microsoft and Intel

    d. Owned and ran company that designed and developed imbedded controllers and testing integrated circuits

    e. Prepared and presented business plans to Board of Directors at Panasonic and other major corporations

20. Mr. Green is the only Certified Biomedical Equipment Technician and Certified Healthcare Technology Manager in either the Kerryville or San Antonio VA facility.

21. Nonetheless, Mr. Green was the only GS-9 employee in the entire biomedical group, between *two* hospitals—Kerryville and San Antonio.

*Mr. Green is Denied Professional Opportunities*

22. When Mr. Green applied for employment with the Agency, he applied to a GS-9 position because that was the only opening at the time. However, given his experience, Mr. Green reasonably expected he would be able to advance to a GS-11 quickly and without issue.

23. To this end, Mr. Green looked out for training opportunities to obtain certifications which would make him (even more) competitive for the GS-11 position. However, while Mr. Green's

    management approved training opportunities for younger technicians, they denied him training opportunities.

24. For instance, in early 2012, Mr. Schneider enrolled Mr. Green in two training classes—however, after allowing Mr. Green to take one class, Mr. Schneider cancelled Mr. Green's second training. By contrast, Mr. Schneider did not cancel the very same training for a younger employee.

25. Mr. Schneider insisted that he would provide Mr. Green further training opportunities, but did not take any action to actually provide these opportunities.

26. Younger technicians did not have any difficulty getting technical training opportunities approved by Mr. Schneider.  As a direct result of his being denied trainings due to his older age, the agency alleged he was less qualified than the younger technicians who were approved for the trainings.

27. In another example, in August 2014, Mr. Schneider refused to approve Mr. Green's request for training, even though allowing Mr. Green to obtain this training would have ultimately saved the Agency upwards of $30,000 as it would have allowed the Agency to complete its own repairs and not source them out.

<em>Comments are Made Regarding Mr. Green's Age</em>

28. It was well known in his workplace that Mr. Green was the "old man" in the shop, as this was a frequent topic of conversation.  However, it quickly became apparent to Mr. Green that his white hair and older age were more than merely a conversation topic.

29. For instance, during his mid-year reviews in 2013 and 2014, Mr. Schneider connected Mr. Green's age as to why Mr. Green would not advance to grade GS-11.

30. In 2013, after Mr. Green asked Mr. Schneider what he could do to make himself more competitive for a promotion, Mr. Schneider pointedly looked at Mr. Green's white hair, and stated that he was a GS-9, and would always be a GS-9.

31. In 2014, during his mid-year review, Mr. Schneider told Mr. Green that a conversion to a Hybrid 38 position classification would not consider Mr. Green's experience or certifications, and stated that Mr. Green would be always GS-9.

*Mr. Green Performs GS-11 Work*

32. Although the biomedical unit should be a three-person shop, in 2014, another biomed technician retired, leaving the shop with only one senior level technician (GS-11) Kerry Cathey.

33. Despite being short-staffed, the Biomedical Shop was able to keep on top of its work orders because Mr. Green routinely accepted assignments to repair sophisticated equipment, which was GS-11-level work.

34. For instance, Mr. Green worked on x-ray machines, even though those duties were supposed to be assigned to a GS-11. Mr. Green's position description also indicates he should work on "stand alone" equipment, but in actuality, he works on equipment that is networked together. These duties are included in the GS-11 position description, but not the GS-9 position description.

35. However, Mr. Green was not a senior level technician (*i.e.* GS-11); he was a mid-level technician (*i.e.* GS-9). Nonetheless, Mr. Green continued to perform work and duties at a higher GS level for which the Agency did not compensate him.

*Mr. Green is Passed Over for a GS-11 Promotion*

36. On January 13, 2015, the Agency listed an opening for a Biomedical Equipment Support Specialist, GS-11. Mr. Green subsequently applied and provided his resume.

37. On March 4, 2015, Mr. Collins informed Mr. Green that no interviews would be conducted in connection with selecting a candidate for the position. However, upon information and belief, Mr. Schneider and Mr. Collins conducted an informal interview with a younger applicant, Sean Caldwell (DOB: June 1975).

38. On March 18, 2015, during a Biomedical department staff meeting that Mr. Caldwell was selected as the Biomedical Equipment Support Specialist, GS-11.

39. Mr. Caldwell is significantly younger than Mr. Green, and has minimal hands-on experience in the biomedical field. Mr. Caldwell's previous experience was predominantly as a low-level or mid-level technician. (ROI-1 121). Mr. Green was plainly more qualified for the position than the younger selectee.

40. Despite Mr. Green's experience and superior qualifications, Mr. Collins told him that he was not selected because Mr. Caldwell was more "reliable."

41. Even though Mr. Collins claimed that the candidates were "equally qualified" when it came to technical capabilities and years of experience (despite Mr. Green's objectively greater experience and superior qualifications), Mr. Collins, as well as Mr. Schneider, were very well aware of Mr. Green's capabilities.  Indeed, Mr. Schneider and Mr. Collins would ask Mr. Green to complete GS-11 tasks and repair GS-11-level equipment because they knew he was qualified and capable of doing so.  Nonetheless, Mr. Collins and Mr. Schneider thwarted Mr. Green's attempts to formally advance to a GS-11 position because he was the "old man" in the shop.

*Mr. Green Contacts EEO Office*

42. On March 19, 2015, *i.e.* one day after learning he was not selected for the GS-11 Biomedical Specialist position, Mr. Green contacted the EEO office and alleged age discrimination due to his non-selection.

*Mr. Green is Again Denied Professional Opportunities*

43. Approximately three weeks after Mr. Green initiated the EEO process, on April 3, 2015, Mr. Green requested administrative time to attend the Association for the Advancement of Medical Instrumentation (AAMI) conference scheduled in June 2015 in Denver, Colorado.  Mr. Green planned to pay for all travel costs/conference fees, and thus it would be of no cost to the Agency.

44. The AAMI conference is nationally renowned.  It provides opportunities for professionals in the medical field, including biomedical technicians such as Mr. Green, to network, learn the latest development in the field, and take courses to earn certification as a Biomedical Equipment Support Technician.

45. Mr. Green, as the only Certified Biomedical Equipment Support Technician in the shop at the Agency, believed the conference would be a benefit to both himself and the Agency as it would

provide him the opportunity to get re-certified, as well as take trainings and continuing education classes on the latest developments which he could apply in his position at the Agency.

46. Moreover, Mr. Green's managers personally benefitted from him being certified, because having a certified employee on their staff entitled them to bonuses and other employment benefits.

47. Mr. Green requested that Mr. Schneider approve him to take administrative leave in consideration for the time and personal cost Mr. Green was expending in engaging in activities that ultimately were for the benefit of his work and the Agency.

48. After over a week of no response to Mr. Green's request, Mr. Schneider finally responded on April 13, 2015, forwarding an email from Mr. Collins that denied Mr. Green's request for administrative leave for the AAMI training. Notably, the email chain established that Mr. Schneider did not forward Mr. Green's request until April 13, 2015, despite having several follow up emails from Mr. Green regarding the same.

49. As a result of the Agency's refusal, Mr. Green had to use his personal annual leave to attend a conference designed to assist him in performing his duties at an exceptional level, and thus ultimately benefited the Agency.

*Mr. Collins Threatens Mr. Green with Demotion if He Pursues His EEO Complaint.*

50. On or about April 22, 2015, after mediation in this matter, Mr. Collins informed Mr. Green that if he lost his EEO complaint, and appealed his rating through a desk audit, then the review board would make their decision based upon Mr. Collins's write-up of Mr. Green's job duties.

51. Mr. Collins clarified his statement, telling Mr. Green that if Mr. Collins did not "do a good enough job" in his write-up, then the review board would "downgrade" Mr. Green's position like they had done at other hospitals.

52. Mr. Collins's tone behind his already threatening words made it clear to Mr. Green that his success was dependent upon Mr. Collins's good-will, and Mr. Collins's good will was dependent upon Mr. Green not pursing his EEO complaint or desk audit for an upgraded position.

53. When Mr. Green stated he would pursue a desk audit, Mr. Collins again told Mr. Green, "you don't want to do that." Mr. Collins was threatening to submit a written summary of Mr. Green's job duties which would reflect a lower grade than the grade at which Mr. Green was currently working, or even lower than the grade he was currently formally assigned, if Mr. Green continued to oppose the discriminatory denial of a promotion to him.

*The Agency Attempts to Hinder Mr. Green's Right to Representation*

54. Despite Mr. Collins's threats, Mr. Green did request multiple times that the Agency complete a desk audit for him. After multiple requests, the Agency finally agreed that it would do a "position review" of Mr. Green's position description.

55. Starting in December 2015, Mr. Green received several emails from Mr. Collins, Mr. Schneider, and Administrative Officer Ms. Rita Arrowood regairdng his position review.

56. These emails were "encrypted," meaning that Mr. Green could not forward, print, or copy the same email. As a result, Mr. Green was hindered in providing these emails (and attachments) to his attorneys, whom the Agency had active knowledge of, and who were assisting Mr. Green in handling his desk audit. (ROI-2 121).

57. Emails that involve sensitive and/or proprietary information are typically encrypted at the Agency. There was nothing in the emails received by Mr. Green that was sensitive or proprietary. The emails were only about Mr. Green's position review. As such, there was no valid reason to encrypt these emails, and the only plausible reason was to prevent Mr. Green from effectively conferring with his legal counsel regarding his position review.

58. In explaining why he encrypted his emails to Mr. Green, Mr. Collins stated that he did not want Mr. Green to be able to share the emails outside of the chain of command, effectively acknowledging that his purpose in doing so was to prevent Mr. Green from being able to confer with his legal counsel about them.

*The Agency Threatens Demotion Based Upon a Position Review*

59. On March 11, 2016, after reviewing Mr. Green's position, Ms. Arrowood sent Mr. Green an encrypted email informing him that his position did not justify a GS-9 rating and should be reclassified as a WG-11.

60. The position review did <u>not</u> review Mr. Green's daily tasks, but only reviewed the GS-9 position description. (ROI-2 XX).

61. Upon this notification, the Agency told Mr. Green that there was "no point" in pursuing a desk audit because if the classification determines the same position description applies, he will lose his "grandfather" status and be downgraded to a WG-11.

*Mr. Green is Denied Training Opportunities-AAMI Conference 2016*

62. On May 3, 2016, Mr. Green received approval through the Veterans Health Administration ("VHA") Attendance and Cost Estimation System ("ACES") to attend the AAMI's 2016 Conference, scheduled for June 3, 2016 through June 6, 2016. The conference, as already discussed, was an excellent training and professional opportunity for Mr. Green and the Agency, and provided him the chance to get his re-certifications as needed.

63. On May 4, 2016, Mr. Green forwarded the ACES approval for the AAMI Conference, asking Mr. Collins to assist him with travel procedures.

64. Three weeks later, on May 25, 2016, Mr. Collins notified Mr. Green that the conference did not "qualify" for financial support, and that Mr. Green would need to finance his conference attendance on this own (and request leave for the same), despite having received approval through ACES.

*Mr. Green is Denied Training Opportunities-BMETS*

65. On May 9, 2016, Mr. Green submitted a request to attend the Basic Networking for Biomedical Equipment Technicians (BMET) training.

66. The BMET training focused on network capabilities and network skills.

67. Even though Mr. Green has a strong background in computers, having a VA-approved certification would help him be competitive for the GS-11 position.

68. On May 11, 2016, Mr. Collins denied Mr. Green's request to attend BMETS, claiming that it was "outside" the scope of his major duties.

*Mr. Green Files his Second EEO Complaint.*

69. On June 8, 2016, Mr. Green contacted the EEO office and initiated his second complaint of age discrimination/retaliation.

*Mr. Smith Becomes Mr. Green's Supervisor.*

70. Subsequent to Mr. Green's second EEO complaint, Mr. Collins left his position and Mr. Smith became Mr. Green's supervisor.

71. Mr. Smith has a proven record of retaliatory animus toward Mr. Green because of his EEO. He stated explicitly that he believed Mr. Green's EEO activity was a problem for his managers.

72. Mr. Smith further referred to Mr. Green's EEO complaints as "harassment." He also stated disparagingly that Mr. Green spent too much "time and energy" on pursuing his civil rights in the EEO process, and that he should spend that time and energy on his work duties.

*Mr. Smith Refused to Provide Mr. Green with Overtime He Was Owed.*

73. In or around June 2017, Mr. Green submitted a request for 19 hours of overtime to his then-supervisor, Mr. Collins, incurred as a result of a training session Mr. Green attended.

74. At the time, Mr. Collins approved 17 hours of the 19 requested. However, Mr. Green never received payment for overtime because Mr. Collins did not submit the authorized time to the payroll clerk.

75. When Mr. Smith took over after Mr. Collins's departure, Mr. Green forwarded Mr. Collins's approval to Mr. Smith, and requested his assistance in getting the overtime pay.

76. Although Mr. Smith promised Mr. Green that he would submit the request for overtime pay to the payroll clerk, he never did so.

*Mr. Smith Hinders Mr. Green's Training Opportunities—Denial of Computer*

77. Mr. Green was scheduled to attend a CT Repair training hosted by Canon Medical Systems from March 26, 2018 through April 6, 2018. Each student was required to bring a laptop computer to attend the training.

78. Therefore, on March 2, 2018, Mr. Green asked Mr. Smith if he could bring a government laptop to the training.

79. Mr. Smith, only days prior to the training, denied Mr. Green's request, and told Mr. Green that he could "share" Mr. Vincente Flores's (Biomedical Technician) government computer, or, Mr. Green could purchase his own computer.

80. Left with no other choice, Mr. Green purchased a laptop and necessary software for $450. If Mr. Green had not purchased the laptop, he would have been unable to attend training, and the Agency's out-of-pocket expenses would have been wasted.

*Mr. Smith Denies Mr. Green's Request for AWS.*

81. In April 2018, Mr. Green submitted a request to Mr. Smith to work an alternative work schedule (AWS), specifically Monday through Thursday, 7:30am to 6:00pm. At the time, Mr. Green was working a Monday through Friday, 7:30am to 4:30pm schedule.

82. Mr. Smith denied Mr. Green's request on April 25, 2018, claiming that there were only three available tours of duty: 06:00 to 4:30 (Mon-Thurs); 07:00 to 3:30 (Mon-Fri), and 08:00-4:30 (Mon-Fri).

83. However, both Mr. Green and Mr. Cathey worked tours of duty other than those cited by Mr. Smith, *i.e.* Monday through Friday 07:30 to 4:30pm. Furthermore, Mr. Green observed that other, younger employees were allowed a variety of compressed work schedules. Mr. Green has observed other biomedical technicians being out of the office on various days and times.

84. Mr. Green made the same request again in September 2018, which was again denied by Mr. Smith.

85. Eventually, when Mr. Melton became Mr. Green's supervisor, Mr. Green's requested AWS schedule was granted.

*Mr. Smith Denies Mr. Green Requested Overtime.*

86. Due to his attendance at the CT Repair training, Mr. Green incurred 24.5 hours of overtime due to travel. (ROI-3 71).

87. After making a verbal request for overtime and receiving no response, Mr. Green emailed Mr. Smith on April 25, 2018, to request clarification as to how he should submit his request. (ROI-3 71).

88. That day, Mr. Smith denied Mr. Green's request for overtime, stating that he was not eligible for travel pay. However, Mr. Green's attendance at the training had been approved through several layers of Mr. Green's management, to include Mr. Smith and the Director. Thus, the Agency was well aware that Mr. Green had to travel for the training. (ROI-3 71).

*Mr. Smith Denies Travel Pay for Attendance at the AAMI Conference.*

89. Since 2015 (except for 2017), Mr. Green has been denied financial support from the Agency to attend the AAMI Conference, despite the clear benefits it provides to the Agency.

90. The conference allows Mr. Green to update his certifications, learn updates on healthcare technology management (HTM), and is heavily attended by Agency employees.

91. The Agency allowed another employee from San Antonio, Katherine Navarro, to attend the AAMI.

92. Once again, on April 26, 2018, Mr. Smith denied Mr. Green's request for travel pay to attend the upcoming 2018 AAMI Conference, without a valid reason.

*Mr. Green Contacts EEO for a Third Time.*

93. On May 24, 2018, Mr. Green reached out to the EEO office for a third time to initiate the EEO process.

94. On August 6, 2018, Mr. Green filed a formal complaint of retaliation with the Agency.

13

*Mr. Green Remains a GS-9 Despite Conversion to Hybrid 38.*

95. In February 2018, Mr. Green was converted from a Title 5 employee to a Hybrid Title 38 employee, which occurred to all Biomedical Technicians at the Agency.

96. As part of the conversion, Mr. Smith promised Mr. Green that the Agency would review his position for the potential for a promotion to GS-11.

97. Upon information and belief, two biomedical technicians were upgraded to a GS-12 upon the conversion to Hybrid Title 38.

98. Nonetheless, on July 5, 2018, Mr. Smith informed Mr. Green that his position would remain a GS-9.

99. In December 2018, Mr. Smith issued Mr. Green a lowered performance review, because he spent time and energy pursuing his civil rights in the EEO process.  Mr. Smith stated that his subordinates who did not pursue the EEO process were more "worthy" than Mr. Green for this reason.

100. Mr. Green's three EEO complaints were consolidated.  On January 16, 2021, the Agency issued a Final Agency Decision (FAD), wherein it was found, *inter alia*, that Mr. Smith lacked credibility, and that he had put forth pretextual reasons for lowering Mr. Green's December 2018 performance review.  The FAD found that Mr. Smith had subjected Mr. Green to unlawful reprisal when he issued him a lowered performance review because he engaged the EEO process.

101. In addition, throughout the time recounted herein, Mr. Green filed multiple grievances through the Agency's grievance process. His management refused to address Mr. Green's grievances.

## STATEMENT OF CLAIMS

102. Defendant subjected plaintiff to unlawful employment discrimination and retaliation in violation the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§

621 *et seq*. (ADEA), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. (Title VII).

103. Defendant subjected plaintiff to a hostile work environment due to his age and protected EEO activity in violation of the ADEA and Title VII.

104. Defendant subjected plaintiff to disparate treatment with respect to numerous adverse employment actions due to his age and protected EEO activity in violation of the ADEA and Title VII.

## JURY DEMAND

Plaintiff demands a trial by jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against Defendant on all Counts, and award Plaintiff reinstatement; lost wages and benefits; compensatory damages, in an amount to be determined by the jury, for pain and suffering and emotional distress; pre- and post-judgment interest; an amount equal to the tax on any award; costs; attorneys' fees; punitive damages; and any such other relief as just and proper.

Respectfully submitted,

 /s/J. Cathryne Watson
J. Cathryne Watson
D.C. Bar No. 1032640
Senior Counsel
Alan Lescht & Associates
1825 K Street, N.W.  Suite 750
Washington, D.C.  20006
Phone: 202-315-1732
Fax: 202-463-6067
Email: Cathryne.watson@leschtlaw.com

## CERTIFICATE OF SERVICE

I hereby certify I caused the foregoing Complaint to be served on defendant via the ECF electronic filing system on September 6, 2021.

<u>/s/J. Cathryne Watson</u><br>
J. Cathryne Watson